[Cite as *State v. Holman*, 2026-Ohio-1793.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | : | APPEAL NO. C-250254 |
| | | TRIAL NO. 24/CRB/16180 |
| Plaintiff-Appellee, | : | |
| vs. | : | |
| | | *JUDGMENT ENTRY* |
| TYIWON HOLMAN, | : | |
| Defendant-Appellant. | : | |

This cause was heard upon the appeal, the record, and the briefs.

For the reasons set forth in the Opinion filed this date, the judgment of the trial court is affirmed.

Further, the court holds that there were reasonable grounds for this appeal, allows no penalty, and orders that costs be taxed under App.R. 24.

The court further orders that (1) a copy of this Judgment with a copy of the Opinion attached constitutes the mandate, and (2) the mandate be sent to the trial court for execution under App.R. 27.

**To the clerk:**

**Enter upon the journal of the court on 5/15/2026 per order of the court.**

**By:**_____
      **Administrative Judge**

[Cite as *State v. Holman*, 2026-Ohio-1793.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO


STATE OF OHIO,                          :          APPEAL NO.    C-250254
                                                   TRIAL NO.     24/CRB/16180
    Plaintiff-Appellee,             :

  vs.                                   :

                                                   *O P I N I O N*

TYIWON HOLMAN,                          :

    Defendant-Appellant.            :


Criminal Appeal From: Hamilton County Municipal Court

Judgment Appealed From Is: Affirmed

Date of Judgment Entry on Appeal: May 15, 2026


*Emily Smart Woerner*, City Solicitor, *Susan Zurface*, Chief Prosecuting Attorney, and *Victoria Gooder*, Senior Assistant City Solicitor, for Plaintiff-Appellee,

*Raymond T. Faller*, Hamilton County Public Defender, and *Christine Y. Jones*, Assistant Public Defender, for Defendant-Appellant.

**Bock, Judge.**

{¶1}   A jury found defendant-appellant Tyiwon Holman guilty of sexual imposition after the State presented evidence that Holman, while holding his erect penis in his hand, pressed himself against his coworker H.H.'s lower back and buttocks. For the foregoing reasons, we overrule Holman's five assignments of error and affirm the trial court's judgment.

## I.  *Factual and Procedural History*

### A.  **Procedural history**

{¶2}   The State charged Holman with one count of sexual imposition in violation of R.C. 2907.06, a third-degree misdemeanor.

{¶3}   During jury selection, Holman moved for a new venire because he asserted the State improperly described the case to the jury. Next, Holman alleged that the State struck a juror based on race in violation of *Batson v. Kentucky*, 476 U.S. 79 (1986). The trial court denied Holman's requests.

{¶4}   The jury found Holman guilty. The trial court sentenced Holman to jail time and informed him of his obligation to register as a Tier I sex offender. The trial court denied Holman's request for a stay pending appeal.

### B.  **Facts**

### 1.  **The State accused Holman of inappropriately touching H.H.**

{¶5}   H.H., during a shift at a restaurant, helped train Holman, a new hire. Alone in the back of the restaurant, H.H. explained to Holman tasks he was expected to accomplish and then began her own work.

{¶6}   Later, Holman told H.H. that he could not locate a container in the walk-in freezer, so H.H. went into the freezer with Holman and pointed it out. H.H. thought it was strange that Holman could not find the container because "they are huge gallon-

sized containers and they are right there." Uncomfortable being alone in the freezer with Holman, H.H. left and returned to her work at a prep table in the kitchen.

{¶7} H.H. testified that Holman "came up behind me and he pushed himself into me. At that point, I felt something hard on my butt and I wasn't sure what it was. I assumed it was either his hand or his penis." H.H. turned to face Holman, who said either "my bad," or "I am sorry." Holman walked away.

{¶8} Though she initially wondered if the encounter was accidental, she soon suspected that Holman's "actions were intended and they were intended with harm." H.H. told her sister (a coworker) and the restaurant's shift leader about Holman's conduct. The shift leader reviewed security footage and then called the store manager, who also reviewed the footage. The store manager recorded the footage with his cell phone "so that we had the video saved."

{¶9} After H.H. became more upset, her mother came to the restaurant, spoke with the manager, and watched the footage. Her mother took H.H. home.

{¶10} The store manager pulled Holman aside and asked him how "the day was going and . . . if he felt like anything weird happened that day." Holman responded that the day was normal. But Holman later told the store manager that "there might have been some accidental bumping in the kitchen."

{¶11} Over Holman's objection, the trial court admitted the store manager's cell phone recording of the restaurant's security video and allowed the State to play it for the jury.

## 2. Holman admitted to police he inappropriately touched H.H.

{¶12} After H.H. filed a police report, law enforcement officers, including Officer Meece, interviewed Holman. The interview was recorded and played at trial. Holman said he stopped working at the restaurant because he "got accused of touching

someone." Holman initially claimed he accidentally walked into H.H. Eventually, he admitted he was holding his penis under his pants when he touched H.H.'s buttocks with his hand.

**{¶13}** After Holman said he was attracted to H.H., officers asked Holman if it "was a self-gratification moment." Holman asked what gratification meant and the officers explained that it meant "satisfying, getting off." After continued questioning, Holman explained that he touched H.H. because, "I think it was me, it was me, uh, that gratification thing that you had said."

## II. Analysis

**{¶14}** On appeal, Holman challenges his conviction in five assignments of error. He asserts the trial court erred by (1) denying his request for a new venire, (2) overruling his *Batson* challenge, (3) excluding evidence of his past sexual abuse and a law enforcement officer's personal knowledge involving male sexual assault victims, (4) admitting the cell phone recording of the security footage, and (5) convicting Holman despite it being contrary to the manifest weight of the evidence.

### A. Assignment of Error 1: Request for new venire

**{¶15}** Holman argues that the trial court erred in overruling his request for a new venire. He asserts that the State improperly provided an introduction of the case without consulting the trial court or defense counsel in violation of Crim.R. 24(A).

### 1. Standard of review

**{¶16}** A party seeking a new venire—also known as a jury panel—bears the burden to demonstrate "either that the jurors were unlawfully impaneled or that the jurors could not be fair and impartial." *State v. Adams*, 2015-Ohio-3954, ¶ 150. Trial courts enjoy wide discretion over voir dire (jury selection), such as its scope, manner,

and "whether to grant a party's motion for a new venire." *State v. Worley*, 2021-Ohio-2207, ¶ 90.

**{¶17}** A trial court abuses its discretion when it acts unreasonably, arbitrarily, or unconscionably in deciding a matter about which it has discretionary authority. *Johnson v. Abdullah*, 2021-Ohio-3304, ¶ 34. No court has discretion to make an error of law. *Id.* at ¶ 38.

## 2. The State summarized the case during voir dire

**{¶18}** During the State's examination of the jury panel, it summarized the case: Holman had been charged with one count of sexual imposition; sexual imposition meant a person having sexual contact with another person while either knowing the contact is offensive or being reckless about if it was offensive; and sexual contact included touching a person's buttocks.

**{¶19}** Next, the State provided undisputed facts: H.H. and Holman had never met before they became coworkers at a restaurant and the "allegation involves the defendant holding his penis through his pants, and putting it against the victim's butt or buttocks."

**{¶20}** The State asked if any potential jurors were uncomfortable serving on the jury, if they disagreed that sexual contact meant touching someone in defined areas, and if anyone had been, or knew someone who had been, the victim of unwanted sexual contact. A potential juror responded that his "wife was molested when she was young." Another explained that his mother "had a similar situation that you just mentioned." A final prospective juror revealed that he believed he was presently under investigation for some form of sexual misconduct.

{¶21} Before voir dire had concluded, Holman objected to the State's explanation of the case, arguing it was improper under Crim.R. 24(A), and requested a new venire. The trial court denied Holman's request.

### 3. Ohio permits parties in a criminal trial to examine juror bias

{¶22} Holman asserts that the State violated Crim.R. 24(A) when it provided a description of the facts of the case without having consulted with the trial court.

{¶23} Under Crim.R. 24(A), trial courts may help potential jurors understand "the nature of the case" by providing "a brief introduction to the case" after consulting the parties. Crim.R. 24(B) requires all prospective jurors to, under oath, be examined. While trial courts may examine the jurors, both the State and the defense may supplement that examination. Likewise, R.C. 2945.27 requires trial courts to "examine prospective jurors under oath" and to allow the State and the defendant the opportunity to reasonably examine prospective jurors.

{¶24} Holman argues that Crim.R. 24(A) limits Crim.R. 24(B) by restricting a party from describing a case's facts unless the trial court first provides a Crim.R. 24(A) introduction in consultation with the parties. We disagree.

{¶25} First, nothing in Crim.R. 24 suggests such a limitation. Crim.R. 24(A) uses permissive language—it says the court "may" introduce the case. As such, this rule means the trial court has discretion to provide or not provide an introduction. On the other hand, both Crim.R. 24(B) and R.C. 2945.27 require the trial court to allow the State and defense "the opportunity to conduct reasonable voir dire."

{¶26} Second, although Crim.R. 24(A) limits when the trial court may introduce the case—only when it consults with both parties—the rule does not place the same limitation on the parties.

{¶27} Third, parties may explain circumstances of the offense to determine if prospective jurors have knowledge of the offense or have biases that might impact their fitness to serve on the jury. *See State v. Tyler*, 50 Ohio St.3d 24, 32 (1990), quoting *Kane v. State,* 3 Ohio Law Abs. 246, 246-247 (7th Dist. 1924) ("In the examination of prospective jurors the state has a right to state the nature of an alleged offense and who was claimed to be connected therewith in order to ascertain whether the jurors knew or had read about the occurrence."); *see also State v. Burns*, 2024-Ohio-1669, ¶ 17 (10th Dist.) (parties may provide some case information to examine potential jurors' biases); *State v. Jackson*, 2005-Ohio-5981, ¶ 52 ("While it is improper for counsel to seek a commitment from prospective jurors on whether they would find specific evidence mitigating, counsel should be permitted to present uncontested facts to the venire directed at revealing prospective jurors' biases." (Citations omitted.)).

### 4. The trial court did not abuse its discretion

The State's presentation of the facts included only undisputed facts: H.H. and Holman, who were coworkers at a restaurant, had never met before the day of the offense. Moreover, the State described facts to which Holman had admitted to police as an allegation: "the allegation involves the defendant holding his penis through his pants, and putting it against the victim's butt or buttocks." It also accurately stated elements of sexual imposition and defined sexual contact, but only after telling the jury that the judge would provide the law.

{¶28} Nothing in the State's summary of the case strayed beyond uncontested allegations or accurate descriptions of relevant statutory language. Significantly, Holman admitted to police that he held his erect penis in his hand under his apron and pressed against H.H.'s buttocks, and, on appeal, Holman's manifest-weight

challenge is limited to contesting whether he engaged in that sexual contact for the purpose of sexual gratification.

**{¶29}** Finally, just after the State summarized the case, it asked prospective jurors if they would feel uncomfortable sitting on a case involving those allegations. This demonstrates that the State's presentation was "arguably made for the permissible purpose of revealing potential juror bias." *See Burns*, 2024-Ohio-1669, at ¶ 17 (10th Dist.).

**{¶30}** We overrule Holman's first assignment of error.

### B. Assignment of Error 2: *Batson* challenge

**{¶31}** Holman argues that the trial court erred in overruling his *Batson* challenge to the State's exercising a preemptory strike of a prospective juror because the State improperly struck the juror based on his race and the State's proffered race-neutral explanation was belied by the record. But because the State's alternate race-neutral explanation for striking the prospective juror supported the trial court's decision, we affirm.

### 1. *Batson* prohibits striking potential jurors based on race

**{¶32}** The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution prohibits the State from engaging in "[p]urposeful racial discrimination in selection of the venire." *Batson*, 476 U.S. at 86. Accordingly, the State may not use peremptory challenges to exclude a prospective juror based on that person's race. *Id.* at 89.

**{¶33}** The *Batson* Court established a burden-shifting framework for analyzing a defendant's challenge to the State's use of a peremptory strike based on racial discrimination. *Id.* at 93-94. First, the defendant must establish "a prima facie case of purposeful discrimination by showing that the totality of the relevant facts

gives rise to an inference of discriminatory purpose." *Id*. To do so, the defendant must show that the defendant is a member "of a cognizable racial group" and the State exercised peremptory challenges to remove potential jurors from the same race as the defendant. *Id*. at 96. If the defendant succeeds in doing so, the burden shifts to the State to demonstrate that it exercised its peremptory challenge using a "permissible racially neutral selection criteria and procedure[]" that is "related to the particular case to be tried." *Id*. at 94, 98. The trial court must consider the circumstances of the case and determine if the State engaged in purposeful discrimination. *State v. Herring*, 2002-Ohio-796, ¶ 63.

**{¶34}** Under *Batson,* "[t]he second step . . . does not demand an explanation that is persuasive, or even plausible." *Purkett v. Elem*, 514 U.S. 765, 767-768 (1995). Rather, the court's consideration is limited to "'the facial validity of the prosecutor's explanation. Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral.'" *Id*., quoting *Hernandez v. New York*, 500 U.S. 352, 360 (1991) (O'Connor, J., concurring in judgment).

**{¶35}** If the State offers a race-neutral justification, the court must move to *Batson*'s final step and determine if the defendant "proved purposeful racial discrimination." *Purkett* at 758. Defendants may present evidence to show racial discrimination, such as (1) data and statistics about the "prosecutor's use of peremptory strikes against black prospective jurors as compared to white prospective jurors" in the case; (2) the State's disparate questioning and investigation of prospective jurors by race; (3) a comparison of which prospective jurors the State kept and struck; (4) "a prosecutor's misrepresentations of the record when defending the strikes," and (5) the State's historical use of peremptory strikes in prior cases. *Flowers v. Mississippi*, 588 U.S. 284, 301-302 (2019). "The ultimate inquiry is whether the

State was 'motivated in substantial part by discriminatory intent.'" *Id.* at 303, quoting *Foster v. Chatman*, 578 U.S. 488, 513 (2016).

**{¶36}** As the party challenging the strike, the defendant maintains the burden of persuasion. *Id.* An appellate court defers to the trial court's finding of no discriminatory intent because the determination largely involves the evaluation of credibility. *State v. Wright*, 2017-Ohio-1568, ¶ 21 (1st Dist.). The trial court's finding will not be reversed unless it is clearly erroneous. *Herring* at ¶ 68.

## 2. The State questioned Juror C about an old conviction

**{¶37}** Holman's *Batson* challenge involves the State's exercising a peremptory challenge to Juror C, who had been retired for 15 years from the Cincinnati Fire Department. Throughout his 35-year career, Juror C interacted with police officers in a mutually beneficial working relationship.

**{¶38}** When the State asked Juror C about a prior conviction for "malicious entry," he explained that the State had prosecuted him 52 years ago for the offense. Juror C was "at the wrong place at the wrong time. . . I went with a person to – basically as his support . . . And it kind of went out of – I never entered." He clarified that although he did not enter the home, he put himself in a bad position and "you have to know the definition of the law."

**{¶39}** The State pressed Juror C about whether he felt he was treated unfairly when he was prosecuted and whether the experience would make him believe that the State was treating Holman unfairly. Multiple times, Juror C denied that his conviction would cause him to disfavor the State. He said that the officers involved in his prosecution were "really more than fair . . . Because I was someplace I shouldn't have been." Further, Juror C pointed out that the conviction was 52 years ago and after his conviction, during his career as a firefighter, he worked "hand in hand with the police."

### 3. The State exercised a preemptory challenge to strike Juror C

**{¶40}** After the State sought to use a peremptory strike to remove Juror C, Holman raised a *Batson* challenge. The trial court asked the State for a race-neutral reason for the strike. The State explained that it sought to strike Juror C because of "the police contact with him" and that Juror C "had said something along the lines of I felt unfairly prosecuted at that time." The State was concerned he would "put himself in the shoes of the defendant and say he is being unfairly prosecuted."

**{¶41}** Holman responded that the State's explanation was pretextual because Juror C's prosecution occurred more than 50 years ago, he had stated that he felt fairly treated during that prosecution, and he had subsequently worked as a firefighter alongside police officers for 35 years. The State again asserted that Juror C had reported feeling unfairly prosecuted. The trial court dismissed Juror C without making any findings.

### 4. *Batson* analysis

**{¶42}** Holman has the initial burden of making a prima facia showing of discrimination. The trial court appears to have found that he did so, as it asked the State to explain its use of the peremptory challenge based on a reason "other than race." Accordingly, we move to *Batson*'s second step. *See Hernandez*, 500 U.S. at 359 (After the State offers a race-neutral explanation for a peremptory challenge and the trial court rules in the State's favor, "whether the defendant had made a prima facie showing becomes moot.").

**{¶43}** The State, under *Batson*'s second step, provided two reasons for striking Juror C: (1) his police contact and prosecution, and (2) his statements showing he felt he had been treated unfairly during his prosecution, which could lead Juror C to believe that Holman was being prosecuted unfairly. Although the State's second

proffered justification directly contradicted what Juror C said during voir dire, on its face, these were race-neutral justifications.

**{¶44}** Holman argued that the State's proffered reason for striking Juror C— "He had said something along the lines of I felt unfairly prosecuted at that time"—is contradicted by the record. He is correct. The State concedes that the prosecutor inaccurately described Juror C's responses as the record shows Juror C did not say he felt unfairly prosecuted.

**{¶45}** But the State's erroneous representation of the record was not the only justification for its preemptory challenge. The other justification was Juror C's prior "police contact." We have held that a prospective juror's prior criminal prosecution may serve as a valid race-neutral reason to strike a juror. *State v. King*, 2007-Ohio-4879, ¶ 29 (1st Dist.) (20-year-old conviction provided race-neutral reason to strike juror); *see State v. Santiago*, 2003-Ohio-2877, ¶ 10 (10th Dist.) (25-year-old criminal-trespass conviction). The State's lengthy examination of Juror C about his prosecution cuts against a finding that its explanation was pretextual. *See Flowers,* 588 U.S. at 312, quoting *Miller-El v. Dretke*, 545 U.S. 231, 246 (2005), quoting *Ex parte Travis,* 776 So.2d 874, 881 (Ala. 2000) ("[T]he State's failure to engage in any meaningful voir dire examination on a subject the State alleges it is concerned about is evidence suggesting that the explanation is a sham and a pretext for discrimination.").

**{¶46}** While some facts support Holman's assertion that the State's proffered reason for striking Juror C was pretextual, we hold that Holman did not demonstrate that the trial court clearly erred. "Comparing prospective jurors who were struck and not struck can be an important step in determining whether a *Batson* violation occurred." *Flowers* at 311. Here, other than the State's concession that the prosecutor

misrepresented the record, we lack evidence that the State engaged in racial discrimination.

{¶47}  We overrule Holman's second assignment of error.

### C.  Assignment of Error 3: Exclusion of Holman's past sexual abuse

{¶48}  Holman next argues that the trial court abused its discretion by excluding evidence involving his sexual-assault history and evidence about male sexual-assault victims generally. He asserts that this evidence was relevant to disprove the "sexual contact" element of sexual imposition.

### 1.  Limits on a defendant's right to present a defense

{¶49}  This court reviews a trial court's decision to admit or exclude evidence at trial for an abuse of discretion. *State v. Fritsch*, 2023-Ohio-2676, ¶ 10 (1st Dist.).

{¶50}  The United States Constitution guarantees criminal defendants the "'meaningful opportunity to present a complete defense.'" *Crane v. Kentucky*, 476 U.S. 683, 690 (1986), quoting *California v. Trombetta*, 467 U.S. 479, 485 (1984). A defendant's right to present a complete defense includes the "right to offer the testimony of witnesses and to present the defendant's version of the facts." *State v. Jones*, 2020-Ohio-281, ¶ 47 (1st Dist.), *rev'd on other grounds*, 2021-Ohio-3311, ¶ 28. But that right is limited because defendants lack a right to present evidence that is inadmissible under the rules of evidence. *Id.*

{¶51}  Under Evid.R. 402, "relevant evidence is admissible" and irrelevant evidence is inadmissible. Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Evid.R. 401. Relevancy is a low bar, reflecting a policy preference in favor of admitting evidence so

factfinders may weigh it as they deem appropriate. *State v. Patterson*, 2018-Ohio-3348, ¶ 21 (1st Dist.).

{¶52} Yet, Evid.R. 403(A) limits the breadth of Evid.R. 402. Trial courts must exclude relevant evidence when "its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury." Evid.R. 403(A). Evidence is unfairly prejudicial where it "'might result in an improper basis for a jury decision'" by "'arous[ing] the jury's emotional sympathies, evok[ing] a sense of horror, or appeal[ing] to an instinct to punish.'" *State v. Mincey*, 2023-Ohio-472, ¶ 32 (1st Dist.), quoting *State v. Crotts*, 2004-Ohio-6550, ¶ 24.

## 2. The excluded testimony

{¶53} In cross-examining Officer Meece, Holman asked about Meece's experience interviewing male sexual-assault victims and asked if "a male . . . can have an erection without contact and be necessarily pleasurable?" The State objected, arguing that the question was irrelevant, Meece was not an expert qualified to testify about male anatomy, and Evid.R. 403 precluded this evidence. Holman responded that the line of questioning was relevant to the sexual-gratification element of the sexual-imposition charge because it would show that although Holman admitted to having an erection when he pressed against H.H., this could happen without experiencing sexual gratification. He emphasized that his question was specific to Meece's own knowledge based on his experience with male sexual-assault victims. The court sustained the State's objection.

{¶54} Later, Meece described the portion of his interview with Holman in which they viewed video footage showing Holman pressing against H.H. Meece asked Holman what he had been thinking. Holman replied that "he'd been having some thoughts." The State objected to questions eliciting the content of those thoughts. It

argued that Holman was attempting to introduce evidence of his own sexual abuse, which was inadmissible under Evid.R. 401, 402, and 403. Holman asserted the evidence was relevant to his mental state. The trial court sustained the State's objection, noting "no case law in Ohio that says [being a victim of sexual assault] is a defense to a charge of sexual imposition . . . This is merely to invoke sympathy."

### 3. The trial court did not abuse its discretion

{¶55} The State charged Holman with sexual imposition, which required the State to prove Holman had "sexual contact" with H.H. R.C. 2907.06(A). "Sexual contact" means touching "an erogenous zone of another, including . . . [the] buttock[s] . . . for the purpose of sexually arousing or gratifying either person." R.C. 2907.01(B).

{¶56} Holman argues that evidence involving male victims of sexual abuse generally and his own sexual abuse was relevant to "show that a male victim of sexual assault could experience an erection without finding the contact to be sexually gratifying." He argues that this evidence would permit the jury to infer that, although he had an erection when he pressed himself against H.H.'s buttocks, he did not experience sexual gratification.

{¶57} But the State was not required to prove that Holman experienced sexual gratification to establish the sexual-contact element. The statute only requires proof that the contact was "for the purpose of sexually arousing or gratifying either person." R.C. 2907.01(B). A person's purpose for acting is distinct from the result of that act.

{¶58} Any probative value of testimony about Meece's general knowledge of male sexual-assault victims and Holman's past sexual abuse would have been substantially outweighed by the danger of unfair prejudice. The trial court did not abuse its discretion by excluding this evidence under Evid.R. 403(A).

{¶59} We overrule Holman's third assignment of error.

16

### D. Assignment of Error 4: Best-Evidence Rule

{¶60} Holman argues that the trial court erred in admitting a cell phone recording of the restaurant security footage in violation of the "best evidence rule."

### 1. The best-evidence rule

{¶61} Under Evid.R. 1002, the "original" of a writing, recording, or photograph should be admitted to prove the contents of that writing, recording, or photograph. "Photograph" includes a video recording. Evid.R. 1001(2).

{¶62} Evid.R. 1003 provides an exception to the best-evidence rule and permits the admission of a duplicate in place of "an original unless (1) a genuine question is raised as to the authenticity of the original or (2) in the circumstances it would be unfair to admit the duplicate in lieu of the original." Evid.R. 1003.

{¶63} An "original" of a photograph "includes the negative or any print therefrom. If data are stored in a computer or similar device, any printout or other output readable by sight, shown to reflect the data accurately." Evid.R. 1001(3). And "[a] 'duplicate' is a counterpart produced . . . by means of photography, including enlargements and miniatures, or by mechanical or electronic re-recording, . . . or by other equivalent techniques which accurately reproduce the original." Evid.R. 1001(4).

{¶64} The party challenging the admission of a duplicate bears the burden of establishing that it should be excluded. *State v. Tibbetts*, 92 Ohio St.3d 146, 160 (2001). We review the trial court's evidentiary rulings for an abuse of discretion. *Id.*

{¶65} Ohio courts have held that video recordings of security footage are admissible as duplicates. *See State v. Ollison*, 2016-Ohio-8269, ¶ 52-54 (10th Dist.) (collecting cases) (duplicate recording of original security footage was admissible where witness who recorded the duplicate testified the duplicate was the same as the

17

original she viewed and witness had no control over skips occurring in the original that were captured in the duplicate).

{¶66} Moreover, recordings depicting portions of a video are admissible as duplicates where the full video would not have revealed anything conflicting with witness testimony or the duplicate. *State v. Biswa*, 2022-Ohio-3156, ¶ 33-36, 41 (2d Dist.) (finding no plain error in admission of shorter duplicate); *see State v. Taylor*, 2012-Ohio-5421, ¶ 32 (8th Dist.) (acknowledging defendant's concession that a duplicate capturing a portion of the original video was admissible as a duplicate).

## 2. The trial court did not abuse its discretion

{¶67} Holman first argues that the duplicate should not have been admitted because H.H. testified about events at the restaurant beyond what the recording showed—that she and Holman had been together in the walk-in freezer.

{¶68} H.H. testified that after Holman could not find a container, she went into the walk-in freezer with him to show him where it was. She thought it was "weird" that he could not find it because it was conspicuous. Further, she felt uneasy being alone with Holman in the freezer because he was someone she "didn't know."

{¶69} The only portions of this testimony with verifiable facts, rather than H.H.'s feelings, were the conspicuous placement of the containers and the fact that no one else was in the freezer. But this testimony did not involve any allegation that Holman acted inappropriately toward H.H. So, assuming without deciding that the trial court should have required the State to show the entire video, the truncated version did not prejudice Holman.

{¶70} Next, Holman argues that the duplicate was altered and therefore inadmissible because it depicted the events in the restaurant at double-speed, which he argues "undoubtably affects the interpretation of the evidence." But Holman has

18

not established that the original differs from the duplicate because there is no evidence of the original's playback speed. The store manager, the shift leader, and H.H.'s mother viewed the original security footage, and all three testified that the duplicate accurately depicted the original security footage.

**{¶71}** Moreover, even if evidence established that the duplicate had been altered, Holman cannot show prejudice. Had the video been slowed to its claimed original speed, a viewer would perceive the contact between Holman and H.H. to last longer, which could cause a viewer to be more likely to interpret the contact as intentional.

**{¶72}** Holman has the burden of showing that under "the circumstances it would be unfair to admit the duplicate in lieu of the original." Evid.R. 1003. He has not done so here, so we overrule his fourth assignment of error.

### E. Assignment of Error 5: Manifest weight of the evidence

**{¶73}** Holman asserts that his conviction is against the manifest weight of the evidence because the State failed to credibly establish that he made contact with H.H. for the purpose of sexual gratification.

### 1. Manifest-weight review

**{¶74}** A manifest-weight-of-the-evidence challenge asserts that the State failed to meet its burden of persuasion at trial. *State v. Sawyer*, 2025-Ohio-5834, ¶ 28 (1st Dist.). A manifest-weight review requires us to view the entire record, weigh the evidence and all reasonable inferences, consider witness credibility, and determine if evidentiary conflicts demonstrate that the factfinder "clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered." *In re Z.C.*, 2023-Ohio-4703, ¶ 14.

**{¶75}** Under R.C. 2907.06(A), the State had to prove that Holman purposely had sexual contact with H.H., knowing that such contact would offend H.H. On appeal, Holman disputes only whether his conduct constituted sexual contact, which, relevant here, means touching another person's buttocks "for the purpose of sexually arousing or gratifying either person." R.C. 2907.01(B).

**{¶76}** Sexual arousal or gratification are not defined by statute, but this court has explained that the phrase encompasses "any touching of the specified areas that a reasonable person would perceive as sexually stimulating or gratifying." *State v. Hodgkin*, 2019-Ohio-1686, ¶ 10 (1st Dist.), quoting *State v. Mack*, 2006-Ohio-6284, ¶ 9 (1st Dist.). A defendant's purpose in having contact with the victim—for sexual arousal or some other purpose—is a question of fact the factfinder resolves by considering the type of contact, the nature of the contact, and the circumstances surrounding the contact. *State v. Alanani*, 2024-Ohio-5660, ¶ 17 (1st Dist.). While the act of touching, alone, is insufficient to establish sexual gratification, it can be considered "'strong evidence of intent.'" *Id.*, quoting *Mack* at ¶ 9.

## 2. The jury did not lose its way

**{¶77}** Holman argues that the State failed to credibly prove sexual contact because the evidence did not establish that he made contact with H.H. for the purpose of sexually arousing or gratifying himself.

**{¶78}** First, Holman asserts that his admission during the police interview—that he touched H.H. for "that gratification thing that you had said"—was clearly Holman parroting back words the officers had said to him. Holman asked what "gratification" meant and an officer responded, "satisfying" or "getting off." While Holman's response referred to what the officer had explained to him, the officer defined "gratification" in simple, understandable terms that Holman appeared to

understand. That an officer defined "gratification" in those terms does not suggest that Holman did not understand what it meant.

**{¶79}** Next, Holman argues that the security footage failed to support his conviction because it showed only brief contact with H.H., his hands were "covering his genitals" under his pants and an apron, and rather than making sexually suggestive comments, he apologized after the contact.

**{¶80}** Holman admitted to holding his erect penis in his hand and pressing that hand against H.H.'s buttocks. This admission constitutes credible evidence supporting the conviction. Simply because the contact was brief does not make the contact's purpose for something other than sexual arousal or gratification. *See State v. Ruschak*, 2025-Ohio-2303, ¶ 15 (11th Dist.). This is particularly true where there was no obvious reason for Holman to have made the contact as he could have easily avoided all contact with H.H. *See State v. Rasheed*, 2023-Ohio-906, ¶ 29 (1st Dist.) ("The video shows Rasheed pressing his pelvic area against G.G.'s backside three different times. His thin stature, when compared to the space where G.G. was standing as he passed her, shows that he had ample room to avoid touching her."); *compare Alanani*, 2024-Ohio-5660, at ¶ 6-7, 18 (1st Dist.) (holding that grabbing witness's genitalia was not for the purpose of sexual gratification or arousal where circumstances showed that defendant grabbed the witness to threaten or intimidate him). And Holman's apology to H.H. after the contact is not enough to show that he made contact with her for a purpose other than sexual gratification or arousal.

**{¶81}** The jury did not lose its way or create a manifest miscarriage of justice. We overrule Holman's fifth assignment of error.

### *III. Conclusion*

**{¶82}** For the foregoing reasons, we overrule Holman's assignments of error and affirm the trial court's judgment.

Judgment affirmed.

ZAYAS, P.J., and CROUSE, J., concur.